IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARTIN CHARLES ABELL, SR.,     *

Plaintiff     *

v     *     Civil Action No. PX-19-2155

RICHARD J. GRAHAM, JR., *Warden*,     *
WEXFORD HEALTH SOURCES, INC., and
CORIZON HEALTH, INC.,     *

Defendants     *
     ***

## MEMORANDUM OPINION

Martin Charles Abell, Sr. brings this suit pursuant to 42 U.S.C. § 1983 alleging that Defendants Warden Richard J. Graham at Western Correctional Institution ("WCI"), and WCI medical providers Wexford Health Sources, Inc. ("Wexford") and Corizon Health, Inc. ("Corizon")[1] subjected him to cruel and unusual punishment by providing inadequate medical care. ECF No. 1. Defendants each filed a motion to dismiss or, alternatively, for summary judgment. ECF Nos. 17, 20, 28. Abell responded. ECF No. 30. The matter is now ripe for review, with no need for a hearing. *See* Loc. R. 105.6. For the reasons that follow, Defendants' motions, construed as motions for summary judgment, are GRANTED.

### I.    Background

Abell is a 67-year-old inmate who has been housed at WCI since August 9, 2013. ECF No. 7-3 at 7. He suffers from hypertension, Type II diabetes, a left eye cataract, cancer, heart disease, an enlarged prostate, high cholesterol, and psoriasis. *See generally* ECF No. 17-3; ECF

---

[1] The Clerk shall be directed to amend the docket to correct the names of Defendants Wexford and Corizon.

No. 17-2.  Abell challenges the adequacy of his medical care for many of his ailments.  The Court reviews Abell's course of care for each significant ailment.

### A.      Eye Care & Cancer Treatment

On August 13, 2015, Abell was diagnosed with a dense cataract on his left eye.  ECF No. 17-3 at 86.  On February 9, 2017, he underwent surgery to remove the cataract.  *Id.* at 226; *see also* Medical Records, CF No. 28-3 at 39.  The surgery, however, was not without subsequent complication.  Abell developed posterior capsule opacification ("PCO"), a cloudy layer of scar tissue that may form behind the lens of an eye after cataract surgery.  ECF No. 17-3 at 143.  As of April 2017, Abell had not received a laser procedure that is standard to correct the PCO.  *Id.*

At Abell's next visit with an ophthalmologist on October 12, 2017, the doctor noticed a one-centimeter lesion near Abell's left eye which the doctor suspected could be cancer.  Abell also had an ulcer on his chest which appeared to extend into the bone that the doctor also suspected was cancerous.  *Id.* at 225.  The ophthalmologist sought a dermatology consultation and request for a skin biopsy of both sites.  *Id.* at 223.  Biopsies confirmed both lesions were cancerous.  *Id.* at 195, 69.  On March 9, 2018, Abell had the lesion on his chest removed successfully, and several months later, the lesion near his eye was also removed.  Id. at 215, 202-03.

On October 26, 2018, Medical Director Dr. Asresahegn Getachew met with Abell.  At that visit, Abell learned that the lesions near his eye and on his chest were healing well, but he now appeared to have new, concerning skin lesions near his naval.  *Id.* at 187.  By January 7, 2019, Abell's skin lesions around his naval were readily apparent.  *Id.* at 168.  Dr. Getachew submitted a dermatology consultation request for biopsy and excision which had been performed successfully.  *Id.*

By July 23, 2019, Dr. Getachew noted at a follow up telemedicine visit with Abell that his

basal cell cancer was in remission.  *Id.* at 116.  Two days later, on July 25, 2019, Abell received

his laser procedure to correct the PCO.  *Id.* at 196.  The procedure went well, and on August 21,

2019, Abell had 20/30 vision in each eye.  *Id.* at 106.

    **B.**    **Diabetes**

    Abell has suffered from Type II diabetes for 15 years, however his condition grew worse

in January 2017.  *See id.* at 208; ECF No. 28-3 at 41-48.  In April 2017, Abell experienced a brief

period in which his diabetes was considered "uncontrolled."  ECF No. 28-3 at 50-51, 65-70.  Abell

also appeared not to comply wholly with his insulin regime from September 2017 to January 2018.

*Id.* at 77, 84-89, 99-103.  As of a March 28, 2018 telemedicine visit with Dr. Getachew, Abell's

testing indicated poorly controlled diabetes, and so Dr. Getachew planned to monitor Abell's

fasting blood glucose and adjust his insulin as needed.  *Id.*

    Dr. Getachew next saw Abell a month later.  At that time, the record reflects that Abell

complained that a certain medication, Metformin, had adverse side effects.  *Id.* at 204-07.  Dr.

Getachew and Abell discussed a medication plan going forward as well as the importance Abell

maintaining a healthy diet, exercising, and taking his medication as directed.  *Id.*

    Regrettably, Abell continued to struggle with medication compliance.  As of October 26,

2018, his diabetes remained poorly controlled.  *Id.* at 187-91.  He was was not reporting to the

dispensary for his morning insulin because he did not like the nurse, and so Dr. Getachew assigned

him to another nurse.  *Id.*  Dr. Getachew also adjusted Abell's insulin dose and scheduled follow

up testing and a visit with an experienced nurse educator.  *Id.*

    In the months that followed, as Abell still struggled with noncompliance, Dr. Getachew

responded by readjusting Abell's medication and providing further patient education.  *Id.* at 170-

73, 181.  Abell refused his medication for several days out of each month.  *Id.* at 156-167; *Id.* at

4-33, 123-24; 116-19.  By July 31, 2019, Abell's blood sugar dangerously high.  *Id.* at 112-15. Several days later, while at the infirmary, Abell acknowledged that he had not been compliant with diet or exercise recommendations.  *Id.* at 109-11.  Although nursing staff continued to encourage Abell to test his blood sugar as directed and take his medication, he subsequently refused on August 21 and 24, 2019.  *Id.* at 2, 105.

On August 26, 2019, Abell again visited the infirmary with dangerously elevated glucose. *Id.* at 103-04.  He complained that the insulin had been causing him pain in his sides and that he was urinating frequently.  *Id.*  A nurse explained to him that this was his body's reaction to the excess sugar.  *Id.*  He again reported to the infirmary the next day.  His glucose remained high despite being on IV insulin.  *Id.* at 101-02.  At that visit, the nurse learned that Abell was carrying sugar packets, jams, and fruits with him and confiscated the sugary items.  *Id.*  Dr. Getachew admitted Abell to the infirmary and prescribed Metformin.  *Id.*

On September 5, 2019, the medical team recommended a psychiatric consultation to address Abell's noncompliance with his insulin therapy.  *Id.* at 96-98.  At Abell's scheduled visit with nurse practitioner Janette Clark on September 28, 2019, Abell shared he was convinced that someone had tampered with his insulin bottles.  *Id.* at 90-92.  Abell asked for, and received, long-acting insulin and that the nursing staff retain the insulin bottles.  *Id.*  A follow up administrative note entered on October 3, 2019, reflects subsequent team conference with medical and mental health providers, the agency contract monitor, and clinical pharmacists to review Abell's diabetic care.  *Id.* at 88-89.  Abell and the team agreed to a medication and monitoring plan.  *Id.*

## C.    Additional Conditions & Need for Wheelchair

During Abell's telemedicine visit with Dr. Getachew on March 28, 2018, Abell shared that he suffered with shortness of breath on mild exertion, which necessitated that he use a wheelchair

instead of walking long distances. *Id.* at 208-10. Upon review of Abell's medical history, significant for prior coronary bypass procedure, Dr. Getachew surmised that Abell may be suffering from uncontrolled coronary artery disease. Dr. Getachew submitted a request for a cardiology consultation. *Id.*

Abell saw a cardiologist via telemedicine on May 21, 2018. *Id.* at 213-14. Abell complained of chest pain that was controlled with nitroglycerin, general fatigue, lack of energy, and intermittent ankle swelling. *Id.* The cardiologist diagnosed Abell with coronary artery disease with progressive angina and adjusted Abell's medication accordingly. The cardiologist also recommended scheduling a cardiac catheterization and coronary angiography as soon as feasible. *Id.*

At the October 26, 2018 telemed visit with Dr. Getachew, Abell discussed his chest pain and difficulty breathing with exertion. *Id.* at 187-91. Dr. Getachew recommended an in-person cardiology evaluation to assess whether Abell needed a nuclear stress test and echocardiogram. *Id.* Abell received the stress test and related studies on December 11, 2018. The testing revealed a large infarct of the left anterior descending artery and other cardiac abnormalities. *Id.* at 81-85.

At Abell's telemedicine visit with Dr. Getachew on January 7, 2019, Abell continued to complain of difficulty breathing with exertion, when lying down, and at night. *Id.* at 170-73. Dr. Getachew reviewed with Abell the results of the cardiology studies, and adjusted Abell's medication to optimize Abell's blood pressure and manage what the medical records termed as Abell's congestive heart failure. *Id.*

On January 22, 2019 Abell underwent a cardiac catheterization at the University of Maryland Medical Center. *Id.* at 76-79. The cardiologist recommended continued aggressive medical therapy with risk factor modifications. *Id.*

On April 15, 2019, Abell was involved in an altercation with another inmate and reported chest pain. *Id.* at 125-29. Abell was transported by ambulance to Western Maryland Regional Medical Center for an evaluation. *Id.* at 130-42. A subsequent EKG was normal, but given his risk factors, Abell was admitted overnight and discharged the following day after a cardiology consultation. *Id.* Upon return to WCI, an order was written for Abell to have a wheelchair pusher for one year. ECF No. 7-6 at 34.

During Abell's telemedicine visit with Dr. Getachew on July 23, 2019, Abell complained of difficulty breathing with exertion but otherwise experienced no chest pain if he used a wheelchair. ECF No. 17-3 at 116-19. Abell has also complained of intermittent urinary tract issues. On August 6, 2019, Abell saw a urologist for blood in his urine. *Id.* at 144-47. Follow-up testing was normal and Abell was prescribed Flomax. *Id.*

### D.    ARPs

Abell filed 30 ARPs at WCI between December 30, 2013 and July 3, 2019. ECF No. 7-7 at 2-4. In this Complaint, Abell specifically refers to 10 ARPs pertaining to his cancer treatment, medications and wheelchair use which were all dismissed as either previously addressed, repetitive, untimely, or deficient for failing to follow instructions. *Id.* Abell filed an additional eight ARPs relevant to his claims, seven of which were again dismissed for procedural reasons. ECF No. 7-8 at 59-68.

Abell filed only one grievance with the Inmate Grievance Office ("IGO") on April 5, 2019, appealing from the disposition of an ARP in which Abell complained that medical staff was trying to kill him by tampering with his insulin. ECF No. 7-9 at 1. On May 15, 2019, the IGO dismissed the grievance as beyond the IGO's jurisdiction because the grievance concerned contractual medical staff and not Division of Correction officers or employees. *Id.*

In this Complaint, Abell contends that he has received constitutionally inadequate medical care in violation of the Eighth Amendment to the United States Constitution. Abell specifically challenges the adequacy of the Defendants medication management, provision of a wheelchair, and diabetes related treatment. ECF No. 1 at 4. Abell seeks monetary and injunctive relief. *Id.*

## II.      Standard of Review

Defendants move for dismissal of the claims or alternatively for summary judgment in their favor. Defendants' pleadings and submission of record evidence puts Abell on notice that the Court may reach the propriety of summary judgment. *See* Fed. R. Civ. P. 56(d). Because the parties have been given reasonable opportunity to present all pertinent material and Abell has not filed an affidavit requesting further discovery under Rule 56(d) of the Federal Rules of Civil Procedure, the Court will treat the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d).

A motion for summary judgment brought pursuant to Rule 56 shall be granted if the movant demonstrates that no genuine issue of disputed material fact exists, rendering the movant entitled to judgment as a matter of law. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must view the evidence in the light most favorable to the non-movant without weighing the evidence or assessing witness credibility.  *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Factually unsupported claims and defenses may not proceed to trial.  *Bouchat*, 346 F.3d at 526.

### III.   Discussion

### A.   Eighth Amendment Claim

Abell's claims squarely raise whether he has been denied adequate medical treatment in violation of the Eighth Amendment, which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  To state an Eighth Amendment claim for denial of medical care, Abell must demonstrate that Defendants' acts or omissions amounted to deliberate indifference to his serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff, aware of prisoner's need for medical attention, failed to either provide such care or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have

inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). *See also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting"). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto*, 841 F.3d at 225. Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

Viewing the record in the light most favorable to Abell, he clearly has suffered from many serious medical needs. However, the record simply cannot support that Defendants' recklessly disregarded such needs with deliberate indifference. The Court addresses each claim of alleged constitutionally inadequate care separately.

### 1. Eye Care & Cancer

The record evidence, viewed most favorably to Abell, reflects Defendants' reasonable responses to Abell's cataracts and skin cancer. Abell received cataract surgery and was noted to be doing well as of February 2017. Although he developed PCO, this is a known complication of the surgery and was corrected with a follow-up laser procedure performed in July 2019. By August

21, 2019, an ophthalmologist noted that Abell was doing well with 20/30 vision in each eye.

Moreover, any delay in follow-up corrective treatment cannot constitute an unreasonable response to Abell's medical needs. The record amply reflects that Abell's skin cancer complicated his cataract treatment. Indeed, an ophthalmologist first noted Abell's cancerous skin lesions which required timely attention and treatment. Then, Dr. Getachew observed additional lesions in October 2018 requiring treatment. Once Abell's skin cell cancer was in remission, he received the laser eye surgery shortly thereafter. Nor does Abell claim that any delay in receiving treatment exposed him to a serious or significant injury. Accordingly, any such delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent." *Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980). Thus, on this record, no evidence reflects Defendants' reckless disregard for Abell's serious medical needs. *See* ECF No. 30; *see also Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105-06.

### 2.    *Diabetes & Other Conditions*

With respect to Abell's diabetes, heart disease and other health issues, the record reflects that Abell received consistent monitoring and attention for his ailments. As for his diabetes, medical staff modified Abell's insulin prescription monthly, if not weekly or daily, in an attempt to keep his diabetes under control. Abell was often noncompliant and failed to report for fingersticks, insulin, and additional medication. Moreover, the record reflects – and Abell does not dispute – that he did not adhere to the diet and exercise recommendations. Notwithstanding that Abell was often his own worst enemy, the medical staff continued to work with him to reach an agreed management plan, which they appear to have established as of October 2019.

Likewise, Defendants continuously monitored Abell's medication for his heart disease and urinary problems. They provided a wheelchair and wheelchair pusher to address his shortness of

breath, and when necessary, sought treatment for Abell at the University of Maryland Hospital and Western Maryland Regional Medical Center. Abell received a stress test, echocardiogram, nuclear medicine myocardial perfusion studies, and ultimately cardiac catheterization. His urinary tract symptoms also appear to have been treated adequately as well.

Abell, in response, summarily asserts that Defendants failed to timely and properly prescribe medication. However, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)). Abell's disagreements with the medication regime he received do not constitute such exceptional circumstances. The record amply reflects that Abell's medical conditions were closely monitored. He was seen in the medical unit often for chronic care appointments, emergency care, and specialist visits. During that time, Defendants routinely evaluated Abell's condition and medication to control his diabetes and additional health concerns. On these facts, viewed most favorably to Abell, he cannot demonstrate that Defendants callously disregarded any serious medical needs. Thus, summary judgment is granted in Defendants' favor as to the Eighth Amendment claims.

### 3.  *Warden Graham*

As to Warden Graham, no record evidence supports that he had direct personal involvement in Abell's medical care or that he interfered with or otherwise prevented him from receiving medical care. At best, the record evidence reflects that Graham played a narrowly circumscribed role in denying Abell's ARPs. However, addressing an inmate's complaint, without more, is insufficient to confer liability. *See Atkins v. Maryland Div. of Corr.*, 2015 WL 5124103 at *6 (D. Md. 2015) (act of denying grievances); *Scott v. Padul*a, 2010 WL 2640308, *3 (D. S.C.

2010) (failure to investigate or process a grievance); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983").[3] Thus, to the extent Abell raised constitutional claims based on Graham's involvement in the ARP process, summary judgment in Graham's favor is granted.

### B.    Negligence Claims

To the extent that Abell also brings medical negligence claims, the Court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). The Court dismisses without prejudice any common law negligence claims so that Abell may pursue them in state court, if possible.[4]

---

[3] To the extent Abell claims that Defendant Graham violated his own policy in processing administrative grievances, such a claim does not rise to a constitutional violation. The adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987); *accord Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015), *aff'd*, 644 F. App'x 243 (4th Cir. 2016). Moreover, "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *see Robinson v. Wexford*, Civil Action No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, arguendo, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated.").

[4] To sustain a medical malpractice claim in state court, Abell must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claim for damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).

### C.    Injunctive Relief

Abell's request for injunctive relief is also denied.  A preliminary injunction is an extraordinary and drastic remedy.  *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  A party seeking a preliminary injunction bears the burden of demonstrating: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009).  As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).  In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

Because the Court has granted summary judgment in Defendants' favor, Abell has not succeeded on the merits of his claims.  For this reason alone, the request for injunctive relief fails. Moreover, Abell has not demonstrated that he is likely to suffer irreparable harm or that the balance of equities tips in his favor.  Thus, Abell's request for injunctive relief must be denied.

### IV.  Conclusion

For the foregoing reasons, Defendants' motions, construed as motions for summary judgment, are granted.

A separate Order follows.

_____8/12/20_____                                    _____/S/_____
Date                                                                  Paula Xinis
                                                                         United States District Judge